Beaty Mae GILLIARD; Samuel Odell Davis; Lorraine Gilliard; Loretta Gilliard; Thomas Gilliard; Dana Gilliard; Gregory Gilliard; Reginald Gilliard; and Samuel Davis Jr. Gilliard, minors, by their mother and next friend, Beaty Mae Gilliard, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Phillip J. KIRK, Secretary, North Carolina Department of Human Resources, in his official capacity, and C. Barry McCarty, Chairman, North Carolina Social Services Commission, in his official capacity, Defendants and Third-Party Plaintiffs,

v.

Otis R. BOWEN, M.D., Secretary United States Department of Health and Human Services, Third-Party Defendant.

Civ. A. No. 2660.

United States District Court,
W.D. North Carolina,
Charlotte Division.

May 7, 1986.

C. White and Jean M. Cary, University of North Carolina School of Law, Chapel Hill, N.C., for plaintiffs.

Lemuel W. Hinton and Clifton H. Duke, Asst. Attys. Gen., N.C. Dept. of Justice, Raleigh, N.C., for defendants and third-party plaintiffs.

Charles R. Brewer, U.S. Atty., Charles E. Lyons, Asst. U.S. Atty., Charlotte, N.C., Bruce R. Granger, Regional Atty., and Edgar M. Swindell, Asst. Regional Atty., Dept. of Health and Human Services, Atlanta, Ga., for third-party defendant.

Jane R. Wettach, East Central Community Legal Services, Raleigh, N.C., and Lucie

**MEMORANDUM OF DECISION**

McMILLAN, District Judge.

## TABLE OF CONTENTS

| | | Page No. |
|---|---|---|
| I. | SUMMARY OF DECISION | 1532 |
| II. | CASE HISTORY | 1533 |
| III. | THE PRESENT CONTROVERSY; THE TEXT OF THE CHALLENGED NEW STATUTE AND REGULATIONS | 1533 |
| IV. | HOW PLAINTIFFS ARE BEING INJURED BY THE NEW STATUTE AND REGULATIONS | 1535 |
| V. | THE CONTROLLING FEDERAL STATUTES AND REGULATIONS NOW REQUIRE THE STATE TO INCLUDE A CHILD RECEIVING ADEQUATE CHILD SUPPORT IN HIS OR HER FAMILY'S AFDC FILING UNIT AND TO COUNT THAT CHILD'S INCOME AS FAMILY INCOME | 1543 |
| VI. | THE LANGUAGE AND LEGISLATIVE HISTORY OF THE 1984 DEFRA AMENDMENT DEMONSTRATE CONGRESSIONAL INTENT TO PRE-EMPT STATE LAW RESTRICTIONS ON THE USE OF CHILD SUPPORT THAT WOULD PREVENT THE STATE FROM TREATING ONE CHILD'S SUPPORT INCOME AS FAMILY INCOME | 1548 |
| | A. Plaintiffs Have Standing To Challenge Whether Congress Has Pre-Empted State Domestic Relations Law | 1549 |
| | B. State Domestic Relations Laws Are Not Pre-Empted Unless Pre-Emption Is Positively Required By A Direct Federal Enactment | 1549 |
| | C. The Language And Legislative History Of DEFRA Demonstrate That Congress Did Intend To Pre-Empt State Law | 1550 |
| VII. | THE FEDERALLY SANCTIONED STATE REQUIREMENT THAT MOTHERS SEEKING AFDC FOR THEIR UNSUPPORTED CHILDREN MUST ASSIGN TO THE STATE THE CHILD SUPPORT RIGHTS OF AN ADEQUATELY SUPPORTED CHILD UNCONSTITUTIONALLY DEPRIVES THE SUPPORTED CHILD OF PROPERTY. WHEN THE STATE COOPERATES WITH A FEDERAL PLAN TO COMPEL A MOTHER TO SURRENDER ONE CHILD'S INCOME SO THAT THE REMAINING CHILDREN CAN SURVIVE ON AFDC, THE STATE TAKES PROPERTY FROM THE CHILD'S TRUSTEE AND IMPOSES AN UNCONSTITUTIONAL TAX ON THE SUPPORTED CHILD'S MEMBERSHIP IN A PARTICULAR TYPE OF FAMILY UNIT. THE STATE THUS BECOMES THE FEDERAL GOVERNMENT'S PARTNER IN A TAKING | 1551 |

Page
No.

A. The Child Receiving Adequate Child Support Suffers A Loss Of Property As A Result Of The Enforcement Of The SFU Regulations .............. 1551

B. By Pre-Empting State Law Restrictions On The Use And Distribution Of Child Support Paid By A Father For The Benefit Of His Child, DEFRA Becomes The Instrument Of A Taking .................................. 1553

C. A Taking Can Occur When Regulation Reshapes A Property Right .... 1553

D. Even If Congress Has Failed To Pre-Empt Those Elements Of State Law That Would Deny The State Access To The Child Support Income Of An Adequately Supported Child Living With His Or Her AFDC Dependent Family, The State Has Forced Mothers To Surrender The Child's Property To The State In Violation Of The State's Own Laws ................. 1555

VIII. A DEPRIVATION OF PROPERTY THAT SIMULTANEOUSLY INFLICTS DAMAGE ON A FUNDAMENTAL INTEREST, FAMILY AUTONOMY, TRIGGERS SPECIAL JUDICIAL SCRUTINY OF GOVERNMENT ACTION CAUSING SUCH INJURIES ............................................... 1555

A. Whether Accomplished By Means Of Federal Pre-Emption Or Otherwise, The Expropriation Of The Supported Child's Property In Order To Reduce Governmental Expenditures Punishes The Child For Exercising The Child's Fundamental Right To Live With His Or Her Family ...... 1557

B. The Supported Children Should Not Be Penalized For Their Mother's Alleged Past Breaches Of A Fiduciary Duty ........................... 1557

C. The DEFRA Scheme Endangers Family Integrity And Undermines The Well-Being Of Family Members ....................................... 1558

D. The DEFRA/SFU Plan Contradicts Existing Incentives For Fathers To Recognize And Honor Their Duty To Support Their Children .......... 1559

E. By Forcing The Realignment Of Parental Duties, The Federal And State Governmental Actions Weaken The Underpinnings Of Family Life ..... 1562

F. Though The Reduction Of Governmental Deficits Is An Important Objective Worthy Of Legislative Attention, The Constitution Should Not Permit Family Duties To Be Destroyed So That Federal Dollars Can Be Saved ................................................................. 1563

IX. THE RELIEF THAT IS DUE ................................................ 1563

X. CONCLUSION ............................................................. 1564

## I. SUMMARY OF DECISION

Plaintiffs are children of low income mothers. They bring this suit through their mother and next friend, on behalf of themselves and similarly situated persons. Not all the children of each mother have the same father. Some of the children are "needy," and have been receiving AFDC (Aid to Families with Dependent Children) payments. Some of the children are not "needy" because their absent fathers are making adequate child support payments to the mother.

The state defendants, acting under a rational interpretation of pertinent recent federal statutes and regulations, are "deeming" the support payments from ab-

sent fathers to be income available to all the dependent children in the house. Defendants are cutting off or reducing AFDC payments accordingly, with tragic results shown by the evidence.

This is an unlawful "taking" of the child's income from an absent father. It also unlawfully deprives the other children in the family of AFDC benefits by destroying or reducing their entitlement because one of the mother's children who has income of his or her own exercises his or her right to live in the mother's family unit.

Regardless of whether federal pre-emption in a technical sense has occurred, the federal scheme has, in fact, overpowered

state family law, and has undermined traditional understandings of family values and duties.

Plaintiffs seek an end to the "deeming" practice. They are entitled to relief.

## II. CASE HISTORY

■ This case has been here before. In *Gilliard v. Craig*, 331 F.Supp. 587 (W.D.N. C.1971) (three judge court), this court enjoined the state defendants from reducing or withholding "the payment of AFDC [Aid to Families with Dependent Children] benefits. ... because of the presumed availability to an AFDC family of [child] support payments which belong to one or more but not all members of that family." *Id.* at 593–94. That decision was appealed to the Supreme Court and was affirmed. 409 U.S. 807, 93 S.Ct. 39, 34 L.Ed.2d 66 (1972), *reh. den., Craig v. Gilliard,* 409 U.S. 1119, 93 S.Ct. 892, 34 L.Ed.2d 704 (1973). The 1971 injunction remains in effect because it has not been stayed, vacated, withdrawn or reversed. *Walker v. City of Birmingham,* 388 U.S. 307, 313–14, 87 S.Ct. 1824, 1828, 18 L.Ed.2d 1210 (1967); *United States v. United Mine Workers of America,* 330 U.S. 258, 293–14, 67 S.Ct. 677, 695–06, 91 L.Ed. 884 (1947); *Wright v. Jackson,* 522 F.2d 955, 958 (4th Cir.1975). Consequently, the state defendants remain subject to the commands of the original injunction pending modification or reversal. *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 439–40, 96 S.Ct. 2697, 2706, 49 L.Ed.2d 599 (1976).

The 1971 class of plaintiffs was

"persons who have been or may be subject to a reduction of AFDC (Aid to Families with Dependent Children) benefits based upon unconstitutional or illegal claim of credit by administering agencies for outside income and other resources available to some but not all of a family group."

*Gilliard v. Craig, supra,* at 588.

The plaintiffs (movants) are members of the same class that was granted relief in 1971. They have filed a motion for further relief, seeking the same sort of relief that was ordered in 1971.

## III. THE PRESENT CONTROVERSY; THE TEXT OF THE CHALLENGED NEW STATUTE AND REGULATIONS

On October 10, 1984, the state defendants put into effect a set of new regulations ("Standard Filing Unit" or "SFU" regulations) reading, in pertinent part, as follows:

*Standard Filing Unit*

A. The parent and all minor children who are brothers and sisters, including half-brothers and sisters, and who are living together *must be* included in the same assistance unit unless:

1. The parent or child is an SSI recipient, or

2. The parent or child does not meet all eligibility factors with the exception of income and reserve. Do not exclude a parent or child because of the amount of income or reserve he has.

Section 2360 III A, State 1985 AFDC Manual (emphasis added) [attached to Plaintiff's Motion For Further Relief].

Implementation of the "Standard Filing Unit" (SFU) regulations triggers the operation of two additional regulatory requirements. According to Section 2350 II of the North Carolina AFDC Manual, the income of all members of the assistance unit is counted as available to the whole unit. Section 2365 II requires that the caretaker of a child in an AFDC filing unit assign to the state any rights to support owed or paid on his or her behalf or on behalf of other family members for whom assistance is requested. Thus, once a child receiving child support income becomes a member of the filing unit as is required by the SFU regulations, the state gains access to that child's income for purposes of reducing the family assistance budget and the state expenditure to the family.

Plaintiffs allege that the new regulations violate the original injunction of this court and the Social Security Act, and wrongfully

deprive them of previously available AFDC benefits.

The state asserts that it promulgated and enforced the "Standard Filing Unit" (SFU) regulation in obedience to and in implementation of 42 U.S.C. § 602(a)(38) (Supp. II 1984) [part of "DEFRA," the 1984 federal Deficit Reduction Act]. That section states that a state AFDC plan *"must"*:

"(38) provide that in making the determination under paragraph (7) with respect to a *dependent child* and applying paragraph (8), the State agency shall (except as otherwise provided in this part) include—

"(A) any parent of such child, and

"(B) any brother or sister of such child, if such brother or sister meets the conditions described in clauses (1) and (2) of section 606(a) of this title, if such parent, brother, or sister is living in the same home as the dependent child, and any *income of or available for* such parent, brother, or sister shall be included in making such determination and applying such paragraph with respect to the family (notwithstanding section 405(j) of this title, in the case of benefits provided under subchapter II of this chapter)...." [Emphasis added.]

Section 606(a), referred to in the preceding quotation, defines "dependent child":

"(a) The term "dependent child" means a needy child (1) who has been deprived of parental support or care by reason of the death, continued absence from the home (other than absence occasioned solely by reason of the performance of active duty in the uniformed services of the United States), or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) at the option of the State, under the age of nineteen

and a full-time student in a secondary school (or in the equivalent level of vocational or technical training), if, before he attains age nineteen, he may reasonably be expected to complete the program of such secondary school (or such training); ...."

Paragraph 7 of Section 602 describes the determination of need by the state agency and provides, in relevant part, that such a state plan *must*

"(7) except as may be otherwise provided in paragraph (8) or (31) and section 615 of this title, provide that the State agency—

"(A) *shall*, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid; ...." [Emphasis added.]

Paragraph 8(A) then requires that the state agency, in making the determination of need for an applicant family:

"(vi) shall *disregard* the first $50 of any child support payments received in such month with respect to the dependent child or children in any family applying for or receiving aid to families with dependent children (including support payments collected and paid to the family under section 657(b) of this title); ...." [Emphasis added.]

(These $50.00 items are referred to as "income disregards" or "disregards.")

The statutory modification worked by Section 602(a)(38) was implemented and explained by regulations from the Department of Health and Human Services. Those regulations, 45 C.F.R. § 206.-10(a)(1)(vii) (1985), provide:

"(vii) For AFDC only, in order for the family to be eligible, an application with respect to a dependent child *must* also include, if living in the same household and otherwise eligible for assistance:

"(A) Any natural or adoptive parent, or stepparent (in the case of States with laws of general applicability); and

"(B) Any blood-related or adoptive brother or sister." [Emphasis added.]

After pointing to these federal instructions, the state asserts that training sessions and discussions with officials from the Department of Health and Human Services in Atlanta, Georgia, and Washington, D.C., have confirmed the state's belief that its action was required by the federal legislation. *See* Affidavit of Kay Fields, Chief, Assistance Payments Section, Division of Social Services, North Carolina Department of Human Resources, p. 2. The state defendants have therefore filed a third-party complaint against the Secretary, seeking contribution from the federal government if the court finds the state has acted improperly and orders the payment of additional benefits.

## IV. HOW PLAINTIFFS ARE BEING INJURED BY THE NEW STATUTE AND REGULATIONS

After the state SFU regulations went into effect in October, 1984, the state sent out letters to AFDC recipients who had children in their households who had not been included in the filing unit. These letters stated:

"Prior to October 1, 1984, family members who lived together were not required to apply for AFDC benefits for everyone. A parent could choose to include or exclude himself or herself and any of the children.

"However, the Deficit Reduction Act of 1984, Public Law 98–369, passed by Congress, requires a change in this rule effective October 1, 1984. Section 402(a)(38) of the Act and Sections 2200 and 2360 of the AFDC Manual state that a parent and all brothers and sisters, including half brothers and sisters, who are living in the same household must apply for AFDC with certain exceptions. Any income or assets of the parent and the children are counted in determining eligibility for the family.

"Our record shows that your family is probably affected by the change in federal law. Therefore, you must contact your worker by _____ to apply for everyone who is re-
(Date)

quired to be in the payment. If you do not contact your worker by this date, your AFDC and Medicaid will be stopped."

Upon contacting their local welfare office, recipients like the plaintiffs were informed that they had to include all children in the filing unit and the child support income received by previously excluded children would now be deducted from the payment amount of a recalculated grant for the new larger AFDC unit. The mother or caretaker would receive only a $50 "disregard" from the child support paid to her on behalf of a previously excluded child. The mother or caretaker was required to sign a form entitled "Assignment of Rights to Support," which authorized the payment of a court ordered support amount for the newly included child[ren] directly to the North Carolina Department of Human Resources. Any support paid directly to the mother or caretaker had to be reported to the county department of social services and that amount, less the $50 "disregard," would then be counted as income when the AFDC grant was calculated.

State defendants estimate that enforcement of the SFU regulations would result in "termination or reduction of benefits to about 11.3% of AFDC cases in North Carolina.... 7,730 cases would be adversely affected, with an annual loss of benefits ranging between $3.0 and $4.7 million annually." *See* Division of Social Services, Planning and Information Section, August 22, 1984 Memorandum, which is Attachment 1 to Memorandum of Law in Support of Plaintiffs' Motion for Further Relief.

The affidavits submitted by the plaintiffs demonstrate how these federal and state directives have been implemented in North Carolina and how the interlocking state and federal plans have affected the income and lives of families like those of the plaintiffs:

1) Diane Thomas has two children, Crystal, age 9, and Sherrod, age 7. Ms. Thomas, age 32, has been unable to find gainful employment although she looks constantly for work. She states:

"4. James Edward Shaw is the father of Crystal. By virtue of a Wake County Court Order, 78 CVD 5056, Mr. Shaw is required to pay $20 a week toward Crystal's support. He almost never complies with the Order, however, and Crystal has been on public assistance for her whole life.

"5. John Pennington is the father of Sherrod. Although there is no civil court order requiring him to do so, Mr. Pennington has regularly paid $200 a month in child support for Sherrod.

"6. Prior to October, 1984, I received an AFDC grant for myself and my daughter Crystal in the amount of $194.

"7. On October 15, 1984, I received a letter notifying me that if I did not reapply for AFDC and include my son Sherrod in the application, the AFDC for Crystal would be terminated.

"8. I did not reapply for AFDC and my assistance was terminated. The reason I did not reapply is that Sherrod's father had on an earlier occasion threatened to harm me physically if I put his son on welfare. He also threatened to attempt to obtain custody of Sherrod.

"9. I asked for a fair hearing to challenge the termination of AFDC. The state hearing officer upheld the decision of the county to terminate my AFDC."

After the hearing mentioned by Ms. Thomas, the hearing officer filed a report in which he noted:

"On October 15, 1984 the county agency notified appellant by letter that her non-assistance child must be added to the budget unit because of a change in regulations. Appellant did not wish to include this child in the assistance grant and requested a local hearing on October 18, 1984 to appeal this action. A hearing in the matter was held on October 26, 1984 and on that same date a decision was rendered affirming the county's requirement to include this child in the grant. Appellant did not apply for assistance for this child, and her grant was terminated on October 29, 1984 effective November 30, 1984."

The hearing officer also found as facts the following:

"Appellant's son and daughter have different fathers.... The father of the male child pays court ordered child support of $200 per month. These payments are made regularly and are routed through the clerk of court's office.

"The Wake County Department of Social Services informed the appellant on October 18, 1984 that new federal regulations required that the male child be included in the Aid to Families with Dependent Children grant and that if application for the child were not made, the grant would be terminated. Appellant did not apply for her son, and her assistance was terminated effective November 30, 1984.

"Appellant contends that her son's needs are met by his support payments and that he does not require assistance. She further contends that she is required by law to use her son's support money solely for his support and maintenance. The son's father has expressed very negative feelings about having his child receive public assistance when he is providing adequate support for the child."

Despite Ms. Thomas' objections, the hearing officer upheld the termination. He found that the county had correctly implemented the SFU regulations, which he found to be consistent with the governing federal regulation, 45 C.F.R. § 206.-10(a)(1)(vii)(B) (1984).

Ms. Thomas' May 2, 1985, affidavit continues:

"10. Because I had no money with which to support Crystal, I finally reapplied for benefits in February, 1985. I included Sherrod on the application as I was required to do, and signed an assignment of Sherrod's support rights to the state.

"11. As of April 11, 1985, John Pennington began to withhold the child's support for Sherrod. He informed me that as long as I was going to use Sherrod's support money to keep up my daughter Crystal, he would continue to withhold the support.

"12. Because I was receiving $200 a month for Sherrod, my AFDC grant was reduced to $73 a month. I could not support Crystal on this amount, so I was forced to use some of Sherrod's support to meet Crystal's needs.

"13. Since my AFDC was terminated in November, 1984, I have been unable to purchase clothing and other necessary items for my children. Our phone service was disconnected in December because I could not pay the bill. I currently have overdue accounts for lights and gas.

"14. Because I have been unable to support both children, members of my family have been providing some assistance. They have their own families and obligations, however, and cannot continue supporting me on an indefinite basis."

By supplemental affidavit, dated September 16, 1985, Ms. Thomas further described her situation:

"1. I have received no direct child support from John Pennington, the father of my son Sherrod, since April 11, 1985.

"2. I was informed by my worker in the Wake County IV–D Unit that she had a meeting with John Pennington about support for Sherrod. On May 22, 1985, John Pennington signed a Voluntary Support Agreement and Order in Wake County 85 CVD 3433. This Agreement requires him to pay child support of $87 month, beginning 7/1/85.

"3. As far as I know, John Pennington did pay the support due for July, because I received a $50 disregard check at the end of August.

"4. Since April, 1985 when Mr. Pennington stopped paying support voluntarily, he has not visited Sherrod. Prior to that time, he visited Sherrod on a regular basis, generally taking his son with him to his home in Durham every other weekend.

"5. Mr. Pennington is extremely opposed to his son being on welfare benefits, and has told me that he stopped seeing his son because I now receive AFDC for Sherrod.

"6. Sherrod is very upset that his father no longer visits him. He frequently asks me why his daddy does not come to see him anymore. Since the time his father has stopped visitation, Sherrod has begun to wet his bed on a frequent basis. Also since the visitation stopped, Sherrod has become much more disruptive, especially in school. Furthermore, his performance in school seems to have declined.

"7. It is my opinion that the lack of visitation with his father has severely affected Sherrod, causing the bedwetting, disruptive behavior and poor school performance. I cannot think of any other aspects of Sherrod's life which have changed or might have caused these behavioral problems."

2) Mary Medlin is the 30-year-old mother of four children, Anthony Medlin, age 14; Roderick Medlin, age 13; Karen Medlin, age 10; and Jermaine Medlin, age 1. Unable to find a full- or part-time job, Ms. Medlin has no earned income. Ms. Medlin states:

"4. John Sanders is the father of Anthony Medlin and Roderick Medlin. His paternity has never been legally established and he has never supported Anthony or Roderick.

"5. Bobby Harrington is the father of Karen Medlin. On January 4, 1980, he signed a Voluntary Support Agreement in Wake County 80 CVD 0053, agreeing to pay $39 a week. During early 1984, he regularly paid about $320 every three months. On August 20,

1984, the court ordered that he pay $200 a month, with $40 a month assigned to arrearages which had built up and $160 a month to current support. He began paying $200 a month in September, 1984.

"6. James Richardson is the father of Jermaine. Since Jermaine was born, Mr. Richardson has provided direct support to his son, purchasing clothing and diapers, contributing to my household bills and paying me $50 cash as child support. A criminal action for support in Wake County, 85 CR 10961 is currently pending against him, because he has refused to sign a voluntary support agreement.

"7. Prior to October, 1984, I received AFDC for myself and my two older children, in the amount of $223.

"8. After October 1, 1984, I was informed by the Wake County Department of Social Services that my AFDC grant would be terminated unless I added Karen and Jermaine to the application.

"9. Although I did not want to put Karen or Jermaine on AFDC, I did apply for them because it was the only way I could receive any income for myself and my other two children.

"10. After I applied with everyone on the application, my whole grant was terminated. The Department of Social Services informed me that because I received $200 in child support for Karen and $50 in child support for Jermaine, my whole family was ineligible.

"11. When I added the two younger children to the AFDC application, I was required to sign an Assignment of Rights to Support form (DSS–1201) on their behalf. This assigned their support to the North Carolina Department of Human Resources.

"12. Because both Bobby Harrington (Karen's father) and I objected to the state taking Karen's child support money, *I agreed to relinquish custody of Karen to her father.* She is, therefore, no longer on my AFDC grant. I signed a Consent Agreement allowing him to suspend his support payments. [Emphasis added.]

"13. After I let Karen go live with her father, I reapplied for AFDC for Anthony, Roderick and Jermaine. My current grant amount is $215 per month. This is the grant for four persons—$244—reduced by $29 per month because Anthony is temporarily out of the home. I also receive $50 per month for Jermaine's support from James Richardson, which I am allowed to keep because of the '$50 disregard.' "

James Richardson, father of Jermaine, has filed an affidavit, which states:

"2. Since the time Jermaine was born, I have been involved in his care and support. I have provided clothing, food and diapers for Jermaine, and have paid some of the household bills for Jermaine's mother, Mary Medlin. I have occasionally brought gifts for some of Mary Medlin's other children.

"3. After Mary Medlin applied for AFDC for her other children, she told me that Jermaine would have to be included in the AFDC application. Because I was taking care of him, I did not think he should be on public assistance and objected to this. She said that if Jermaine were not placed on AFDC, she would lose her AFDC for all her other children. Upon learning that, I reluctantly consented to having Jermaine placed on the AFDC grant.

"4. *Shortly after Jermaine was placed on the AFDC grant, I was contacted by Nancy Dickerson at the Child Support Enforcement Unit in Wake County. She requested that I sign a voluntary*

*support agreement to pay approximately $165 per month. I asked if all the money would go to Jermaine she explained that if I paid that amount, only $50 would go to my child, and the rest would be kept by the state to pay for Ms. Medlin's AFDC grant. I told her that I did not think that was right because Jermaine had never been on AFDC and the state should not get Jermaine's support. Although I was, and am, interested and willing to support my son, I refused to sign the agreement unless the money would go to Jermaine.* [Emphasis added.]

"5. Soon after that meeting, a sheriff came to my job to serve me with a warrant for criminal non-support, case number, 85 CR 10961, Wake County. I was not there and had to pick up the warrant at the sheriff's office.

"6. I hired an attorney to assist me with this case because I did not believe I should have to pay support that would not be used for my own child. My attorney was unable to obtain the results I sought, which would have allowed my child to receive all my support. He advised me to sign a support agreement in the amount of $136 a month, which I reluctantly did."

3) Joyce Miles, 34, has five children, DeAngela Allen, age 17; Felicia Allen, age 14; Larry Miles, age 10; Johnetta Miles, age 6; and Kisha Miles, age 5. Ms. Miles does not have a full- or part-time job. She states:

"4. The father of my two younger children is John Brown. No legal paternity determination was ever made with regard to him and he has never been ordered to pay support. He has never supported these two children.

"5. The father of Larry Miles, Jr. is Larry Miles. He was originally or-

dered to pay support pursuant to Wake County 76 CR 64672. As of October 31, 1983 he was $4,803 in arrears. On July 18, 1984, he signed a Voluntary Support Agreement and Order in Wake County, 84 CVD 4576 to pay $108 per month toward current support and $22 a month toward the arrearages.

"6. The father of the two oldest children is Arthur Allen. Pursuant to Wake County 83 CVD 3122, he regularly pays child support of $189 per month for his children.

"7. Prior to October, 1984, I was receiving AFDC in the amount of $244 per month for myself and my three younger children. The two older children were receiving $189 per month child support from their father.

"8. After October, 1984, the Wake County Department of Social Services required me to add my two older children to the AFDC application. I was informed that my entire grant would be terminated unless I reapplied and included all the children.

"9. Although I did not want to put my two older children on AFDC, because they are adequately supported, I did so because it was the only way I could receive any income for myself and the three younger children.

"10. When I added the two older children to the AFDC application, I was required to sign an Assignment of Rights to Support form (DSS 1201—attached) on their behalf. This assigned their support to the North Carolina Department of Human Resources.

"11. Because of this Assignment, my older children do not receive the $189 child support they are entitled to receive from their father. It is diverted by the Clerk of Court to

the Department of Human Resources.

"12. With myself and the three younger children on the AFDC grant, my payment was $244 a month. With all five children on the grant, my payment is $288 a month. (I am currently receiving only $278 per month because the Department of Social Services is collecting an overpayment.) I also receive a $50 monthly check, called the child support disregard.

"13. Because of the loss of most of the child support, I have been unable to provide for the two oldest girls as I was able to before. I have been unable to purchase such things as class rings, shoes and clothing."

4) Arvis Waters, age 29, has five children, Allen Waters, Jr., age 10; Andre Waters, age 8; Alise Waters, age 7; Bernard Williams, Jr., age 2; and Aaron Williams, age 1. Ms. Waters attends North Carolina Central University full time and participates in a work-study program while taking care of her children, but she earns no income. Ms. Waters states:

"4. The father of my three oldest children is Allen Waters. He pays no support for his children. Because of his extremely violent behavior, I have been exempted from the requirement that I assist the Department of Social Services in obtaining support from him.

"5. The father of the two youngest children is Bernard Williams. He regularly pays child support of $45 per week for his children. He pays this support pursuant to an Order of the Family Court of the State of New York, County of Bronx, docket number P–78667/83, dated March 23, 1984.

"6. Due to my lack of income or child support for the three oldest children, I applied for AFDC benefits for myself and three oldest children in August, 1984. Before the application was completed however, I was informed by my eligibility worker at the Durham County Department of Social Services that my two youngest children must also be included in the AFDC application.

"7. Although I did not want to put my two youngest children on AFDC, because they are adequately supported, I did so because it was the only way I could receive any income for myself or the three oldest children.

"8. When I added the two youngest children to the AFDC application, I was required to sign an Assignment of Rights to Support form (DSS 1201—attached) on their behalf. This assigned their support to the North Carolina Department of Human Resources.

"9. Because of this Assignment, my youngest children do not receive the $45 weekly child support they are entitled to receive from their father. It is diverted by the Clerk of Court to the Department of Human Resources.

"10. With myself and the three oldest children on the AFDC grant, my payment would have been $244 a month. With all five children on the grant, my payment is $288 a month. Although I am entitled to receive a $50 monthly check, called the child support disregard, I have not been receiving this.

"11. I appealed the decision requiring me to add my two youngest children to the AFDC grant and sign an assignment of their child support at a State Administrative hearing. On February 21, 1985, I received a Notice of Decision which upheld the County Department's decision that I must include my youngest two children in the AFDC application and assign their support to the state.

"12. Due to only receiving a total of $288 per month for me and my five children to live on, I am not able to provide my children with many of the things I would like to. For example, I can never buy my children new clothes and even though I keep my children clean, they often aren't dressed the way I would like or the way other children at day care are. Also, there is no money left after the necessary bills are paid and therefore I can never buy any toys or special things for them like other children in the neighborhood have. Next week is the birthday of one of my children and I cannot even afford a birthday present. If I got the support money for my two younger children, I would be able to at least buy a few things for them other than absolute necessities and then they wouldn't feel so left out. Also, my youngest child needs a car seat and a high chair and I cannot afford to buy either."

By supplemental affidavit, Ms. Waters offered this information:

"1. Since the time the Standard Filing Unit went into effect, my family and I have been off and on AFDC several times. I am not currently receiving AFDC benefits, but have reapplied.

"2. My understanding is that the father of my two youngest children regularly pays $45 a week into the Clerk of Court in Bronx, New York. This money is not transmitted to me or the Clerk of Court in Durham County, North Carolina on a regular basis. The Clerk in New York has informed me that the office there is too backlogged to send the money as it is paid in.

"3. I moved to North Carolina from New York in May, 1984. The last child support I received in New York was in April, 1984. I worked from May through August and did not receive any AFDC benefits during that time. Because of the backlog in New York, however, I did not receive any of the child support paid for those months.

"4. When I returned to school in September, 1984, I began to receive AFDC benefits. I received AFDC from September through December 1984.

"5. In November, 1984, accumulated child support of $495 was sent to me. This caused my AFDC check to be terminated effective December 1, 1984, despite the fact that this amount represented child support during the months I worked and was not receiving AFDC. I had no income for December, January and a portion of February.

"6. I was permitted to reapply for AFDC in February, and was reinstated, at the rate of $288 a month, in March. I also received a pro rated check for part of February.

"7. I continued to receive $288 per month in AFDC benefits through July.

"8. In May, another accumulated child support check, for $585, was sent to me from New York. I reported this to the Department of Social Services and was informed that it would cause my AFDC to again be terminated. For reasons I do not understand, the AFDC check was not terminated, and I received $288 in AFDC through July.

"9. In August, my AFDC check was in the amount of $195. I was informed by my worker that my benefits were being reduced to recoup the benefits I received after receiving the May child support check. I have not been informed how much the department intends to recoup.

"10. Also in August, I checked with the Durham Clerk of Court's office and learned that $810 in child support had been sent from New York in July. This money was sent to

the North Carolina Department of Human Resources. I immediately went to talk with my worker at Durham D.S.S. to learn how that money would be distributed. My worker told me that if I returned the August AFDC check, I could receive all but $288 out of the $810 support check. The $288 would reimburse the state for the AFDC paid in July, the month the support was received.

"11. I returned my August AFDC check and voluntarily terminated my AFDC case, based on the information obtained from Durham D.S.S. At the end of August I received a check for $50, representing the disregard for the July support received.

"12. I returned to D.S.S. to try to learn why I had only received $50. At that time my worker said he had been mistaken and that all the remainder of the $810 in child support would be retained by the state. I tried to get my August check back, but that request was denied. I reapplied for AFDC, but have not yet been certified or received any money.

"13. *Other than the one $50 payment I received in August, I have not received any child support disregard checks.* [Emphasis added.]

"14. As a result of being without income, I have absolutely no money. I have run out of just about everything that cannot be purchased with Food Stamps, such as soap, toothpaste, toilet paper, etc. My rent has not been paid for September. When my son had an asthma attack, I did not have enough cash to pay a cab to get him to the health clinic. Both Aaron and Bernard are pigeon toed and need to wear hard shoes, but I cannot by [sic] them. None of the children have had any new clothes or shoes for several months. It is only through the kindness of a friend that I even have diapers for the baby. I am extremely frustrated and do not understand why my children cannot get the child support being paid for them."

5) Diane Jefferys, age 25, has four children, Latoya T. Jefferys, age 8; Anettress T. Jefferys, age 5; Shanta M. Jefferys, age 4; and Anthony T. Jefferys, age 2. Ms. Jefferys is unemployed and is without any independent source of income of any kind. She states:

"4. I am married to Michael Jefferys, although we have been separated for many years. He is the father of Latoya and Anthony. As a result of a court order in the Wake County case 79 CVD 2360, he is required to pay $51 a week in support.

"5. Johnny Michael Shannon is the father of Shanta and Anettress. No paternity determination has been made by a court regarding Mr. Shannon, nor has he been ordered to pay support.

"6. Prior to October, 1984, I received AFDC for myself and Anettress and Shanta in the amount of $223 a month. I received child support from Michael Jefferys of $204 per month. The total was $427.

"7. After October, 1984, I was required to add Latoya and Anthony to the AFDC grant. Neither I nor the children's father wanted them added to the welfare unit, but I had no real choice because I had to have some income to support Shanta and Anettress.

"8. In November, 1984, my AFDC grant increased to $267 per month. I also received a $50 check each month as the child support disregard.

"9. I have not received a $50 disregard check since May, 1985. I later found out this was because Michael Jefferys stopped paying support. I don't know why he stopped

paying support, but he has told me that he feels like when he pays, his children do not really benefit. He feels like he is supporting all my kids when he pays support.

"10. My AFDC check is now my only income. It has gone up to $294 because of the ten percent increase that went into effect July 1, 1985.

"11. After my income dropped, I experienced extreme financial difficulties. I could barely afford the rent of $200 per month for my house on my income of $427 per month. After the new rule went into effect and my income went down I got behind on my rent and was evicted in June. I could not find a place to live that I could afford on my lower income. I had to move in with my cousin, who already had a household of four. Due to her kindness my family has been able to stay there, but we really need a place of our own. I got behind on most of my other bills and have had a terrible struggle trying to keep the bunk beds I bought for my children. I cannot buy any clothes or shoes for the children, and have been getting used clothing from charitable organizations. I have had to miss several doctor's appointments because I have not had money to pay for transportation."

While plaintiffs' affidavits poignantly and effectively document the economic and personal consequences of the SFU regulations, it is also helpful to note the actual income reduction suffered by those movant children who are forcibly included in the AFDC unit and whose child support rights are then assigned to the state. A chart supplied by the movants illustrates the income lost by each child previously receiving child support:

| Family | Pre SFU | Post SFU | Reduction |
|---|---|---|---|
| Sherrod Thomas | $200/mo | $74 + $50 = $124 | 38% |
| Aaron & Bernard Williams | $194/mo | $96 + $50 = $146 | 25% |
| Felicia & DeAngela Allen | $189/mo | $96 + $50 = $146 | 23% |
| Latoya & Anthony Jefferys | $204/mo | $106 + $50 = $156 | 24% |
| Karen Medlin | $200/mo | $53 + $50 = $103 | 48.5% |

V. THE CONTROLLING FEDERAL STATUTES AND REGULATIONS NOW REQUIRE THE STATE TO INCLUDE A CHILD RECEIVING ADEQUATE CHILD SUPPORT IN HIS OR HER FAMILY'S AFDC FILING UNIT AND TO COUNT THAT CHILD'S INCOME AS FAMILY INCOME.

In 1971, this court invalidated the North Carolina policy of classifying child support in amounts exceeding the state determined need levels as a resource available to the family in which the child lived and thereby reducing the amount of AFDC benefits for that family. This decision reflected the conclusion that this policy violated the intent of the Social Security Act as then written. The court found that the Act obviously intended to provide assistance only to needy children. Classification of a child as needy was based on a comparison of the child's resources with the state need standard. By demanding that a child receiving child support in excess of the need standard had to be included in the AFDC unit, North Carolina officials disregarded congressional intent to include only needy children in such units. In addition, in 1971, this court found that the North Carolina

practice ignored the limitations imposed by 42 U.S.C. § 602(a)(7), which authorized state officials, in making need determinations, to consider a child's resources in determining a child's needs, but did not authorize nor require that resources available to only one child living in an AFDC home should be treated as a resource available to the whole family. Since a child receiving child support had no apparent legal duty to support the other members of his or her family, the child's income could not be treated as a family financial resource.

Plaintiffs now assert that, despite the changes made in the Social Security statute by the Deficit Reduction Act ("DEFRA") amendments, the Standard Filing Unit ("SFU") regulations continue to contradict the purpose of that Act by (1) including ineligible children in the assistance unit and (2) presuming that child support payments made to one child in a family represent income available to the family as a whole.

In order to evaluate plaintiffs' statutory challenges to the SFU regulations, it is helpful to examine the legislative history and the language of the DEFRA amendment.

In May, 1983, Secretary of Health and Human Services Margaret M. Heckler submitted a legislative proposal to Vice President George Bush as President of the Senate. Her proposal, aimed at minimizing state and federal AFDC expenditures and thereby reducing the federal deficit, contained a "group of related amendments to establish uniform rules on the family members who must file together for AFDC, and the situations in which income must be counted. In general, the parents, sisters and brothers living together with a dependent child must all be included; *the option of excluding a sibling with income, for example, would no longer be available.*" Page 1 of Exhibit A to Federal Defendant's Motion to Dismiss And In the Alternative For Summary Judgment. [Emphasis added.] In a "Section-by-Section Summary" of the proposed amendments to the Social Security Act, Secretary Heckler described those amendments captioned "Parents and Siblings of Dependent Child Included in AFDC Family" as follows:

"Section 102 of the draft bill would further amend the plan requirements contained in section 402(a) of the Social Security Act by adding a new requirement that the State include, as a member of the AFDC family (both the needs and the countable income of) the parents and the minor siblings of the dependent child for whom aid is claimed and who are living with the dependent child if the siblings are, themselves, deprived of parental support or care and under the age limit selected by the State.

"The general inclusionary rule does not, however, include stepbrothers and stepsisters of the dependent child nor does it include, if the dependent child has attained age 16, the employable parent of the child. Once it has been determined that the parent or sibling must be included in the AFDC family unit, one consequence is, as would be made explicit within paragraph (37), that *any income of the parent or sibling must be considered as part of the family's income* for purposes of determining eligibility and benefit amount, notwithstanding section 205(j) of the Social Security Act, in the case of OASDI benefits. This amendment would become effective October 1, 1983." *Id.* at pp. 3–4. [Emphasis added.]

Although the Secretary's legislative proposal was not adopted by Congress when it was originally submitted in the 1983 legislative session, similar changes were enacted as part of the Deficit Reduction Act of 1984. The legislative history of the 1984 Act demonstrates that Congress accepted the core of the Secretary's proposal when they passed 42 U.S.C. § 602(a)(38).

The Senate Finance Committee's explanation of the pertinent DEFRA change reads as follows:

B. *Income Maintenance Provisions*

*Aid to Families With Dependent Children (AFDC) Provisions*

1. Parents and Siblings of Dependent Child Included in AFDC Family (sec. 971 of the bill)

(Contained in S. 2062 as originally reported)

*Present Law*

There is no requirement in present law that parents and all siblings be included in the AFDC filing unit. Families applying for assistance may exclude from the filing unit certain family members who have income which might reduce the family benefit. For example, a family might choose to exclude a child who is receiving social security or child support payments, if the payments would reduce the family's benefits by an amount greater than the amount payable on behalf of the child. In addition, a mother who is a minor is excluded if she is supported by her parents. However, if she has no income of her own which may be attributed to her child, the child may qualify for assistance as a one-person unit, and receive proportionately more in assistance than it would receive as part of a two-person unit. The income of the parents of the minor parent is not considered in determining the eligibility of the child.

*Explanation of Provision*

The provision approved by the Committee would require States to include in the filing unit the parents and all dependent minor siblings (except SSI recipients and any stepbrothers and stepsisters) living with a child who applies for or receives AFDC. In addition, if a minor who is living in the same home as his or her parents applies for aid as the parent of a needy child, the income of the minor's parents would be counted as available to the filing unit. The rules that would be used in determining the amount of available income would be the same as are currently used in counting the income of stepparents.

This change will end the present practice whereby families exclude members with income in order to maximize family benefits, and will ensure that the income of family members who live together and share expenses is recognized and counted as available to the family as a whole. A similar provision was approved by the Committee last year, but was dropped in conference with the House.

S.Rep. No. 98–169, Senate Comm. on Finance, 98th Cong., 2d Sess., Deficit Reduction Act of 1984, Explanation of Provisions Approved by Committee on 3/21/84, 980 (Comm.Print 1984).

The Conference Report also indicates that, while the House initially made no change in the law, it later agreed to adopt the Senate amendment with one modification:

24. Parents and Siblings of Dependent Child Included in Filing Unit

*Present law*

There is no requirement in present law that parents and all siblings be included in the AFDC filing unit. Families applying for assistance may exclude from the filing unit certain family members who have income which might reduce the family benefit. In addition, a mother who is a minor may be excluded if she is supported by her parents. However, if she has no income of her own which may be attributed to her child, the child may qualify for assistance as a one-person unit. The income of the minor parent's parents is not considered in determining the eligibility of the child.

*House bill*

No provision.

*Senate amendment*

Requires States to include in the filing unit the parents and all minor siblings living with a dependent child who applies for or receives AFDC. SSI recipients and stepbrothers and stepsisters are excluded from this requirement. In addition, if a minor who is living in the same home as his parents applies for aid as the

parent of a needy child, the income of the minor's parents would be counted as available to the filing unit. The rules that would be used in determining the amount of available income would be the same as are currently used in counting the income of stepparents. Effective April 1, 1984.

*Conference agreement*

The conference agreement follows the Senate amendment with the following modification: amonthly [sic] disregard of $50 of child support received by a family is established. The disregard is applied at eligibility determination and benefit calculation. The provision is effective October 1, 1984.

H.Conf.Rep. No. 98–861, 98th Cong., 2d Sess., *reprinted in* 1984 U.S. Code Cong. & Ad. News 697, 751,1401.

Despite the DEFRA changes, plaintiffs contend that the children receiving child support payments in excess of the individual need standard cannot properly be included in an AFDC filing unit. Plaintiffs point to the language of 42 U.S.C. § 606(a) which defines "dependent child," the intended AFDC beneficiary, as a *"needy* child (1) who has been deprived of parental support or care by reason of the death, continued absence from the home ... or physical or mental incapacity of a parent, and who is living with [a relative] in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) at the option of the state, under the age of nineteen and a full-time student...." [Emphasis added.]

Plaintiffs argue that the child support income of the affected children makes them ineligible for assistance because, by virtue of receiving such payments, they are not needy children. Their individual incomes exceed the prorated state need standard for persons living in an AFDC unit.

However, the legislative history clearly shows that the intent of the DEFRA amendment is to measure need by assessing the aggregated resources of all family members. The legislative history also makes clear that the option of choosing which members of a family may be included in the assistance unit is no longer available to families whose members have different individual sources of income. Consequently, the financial circumstances of an individual child are no longer determinative of that child's exemption from the AFDC unit but are now relevant to an appraisal of the eligibility of his or her mother and half sisters or brothers for AFDC benefits.

Plaintiffs further insist that a child receiving child support payments cannot meet the definitional requirements of § 606(a)(1). Such a child is not deprived of parental support. Defendants respond by offering a literal but credible interpretation of clause (a)(1) in light of DEFRA's legislative history. Defendants point out that deprivation is defined in terms of "support *or care"* [emphasis added] and argue that a child receiving child support may still be considered deprived because he or she is not cared for by his or her absent father. The court finds that the defendants' literal interpretation reflects the intent of the statutory modification accomplished by DEFRA.

Finally, plaintiffs state that "nothing in the statute or its Conference Report states that legally restricted child support payments should be counted dollar for dollar in making a determination of need for the dependent child. In fact, the statute never mentions child support, nor does the final Conference Report which accompanies it." Plaintiffs urge that § 602(a)(7) only directs a state agency to "take into consideration" the income of dependent brothers and sisters when making a determination of need. Plaintiffs suggest that the constitutional implementation of this construction would be to consider income of other deprived siblings but exclude any money that was legally restricted for the use of only specified children. Plaintiffs find nothing in the legislative history to compel a different result. Instead, plaintiffs assert that a constitutional reading of the disputed statutory provisions will not permit counting income that is legally restricted for the use and benefit of only one child as family

income. Plaintiffs believe that, when interpreted to avoid constitutional infirmities, the statute does not demand such attribution of income.

The court agrees that the constitutional approach to income evaluation would be to exclude legally restricted income. That would be the constitutional approach, but it was not the *congressional* approach.

The court has a duty, when possible, to construe a statute so as to avoid a constitutional question; nevertheless, to give this federal statute the reading plaintiffs suggest is to ignore its legislative history and to read it to be pointless legislation. Unless Congress intended to count the child support resources as available to the family as a whole, little or no saving would be accomplished. In addition, despite plaintiffs' attempts to offer a limiting reading of the statutory language, the Senate Report and the Conference Report obviously contemplate the inclusion of child support income in an applicant family's budget.

The Conference Report in particular confirms the intended consequences of the statutory amendments. After discussing the previous law which had imposed no requirement that parents and all siblings be included in the AFDC filing unit and after noting that families had been able to exclude from the filing unit members whose income might reduce the family benefit, the Conference Report indicates that "the conference agreement follows the Senate version with one modification, the establishment of a $50 disregard of *child support* received by the family." [Emphasis added.] The Senate version, which required states to include in a filing unit the parents and all minor siblings living with a dependent child who applies for and receives AFDC, was designed to *"end the present practice whereby families exclude members with income in order to maximize family benefits, and will ensure that the income of families that live together and share expenses is recognized and counted as available to the family as a whole."* S.Rep. No. 98–169, *supra.* [Emphasis added.]

This Senate amendment, adopted by Congress with one modification in conference committee, tracks the Secretary's original proposal so closely that the Secretary's interpretation of the act's meaning through promulgation of regulations becomes important. One regulation, 45 C.F.R. § 233.-20(a)(3)(ii)(D) (1985), offers particular assistance in clarifying the statutory meaning:

(D) Income after application of disregards, except as provided in paragraph (a)(3)(xiii) of this section, and resources available for current use shall be considered. To the extent not inconsistent with any other provision of this chapter, income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance.

The regulatory distinction between "actually" available and "legally" available income corroborates the defendants' contention that Congress intended the attribution of child support income to other family members as a means of reducing AFDC expenditures.

Thus, the only way Congress can have made the statutory presumption of availability effective is by pre-empting that portion of state child support laws that makes the child support money the exclusive property of the child in whose name the child support order was issued or in whose name the money was voluntarily delivered, regardless of the mother's handling or distribution of the funds. Otherwise, the child's money would be unavailable under state law and the statutory presumption would be only a figment of the congressional imagination. In *Heckler v. Turner,* 470 U.S. 184, 105 S.Ct. 1138, 84 L.Ed.2d 138 (1985), the Supreme Court has recently explained that the principle of actual availability of resources and income has, for AFDC purposes, "served primarily to prevent the States from conjuring fictional sources of income and resources by imputing financial support from persons who have no obligation to furnish it or by over-

valuing assets in a manner that attributes non-existent resources to recipients." The same limitation should presumably be applied to federal action regarding the attribution of income unless conflicting state law has been overridden by federal enactment. Plaintiffs reply that despite the explanation provided by the legislative history, Congress did not accomplish a pre-emption of state law that satisfies judicially defined requirements.

Here plaintiffs' statutory and constitutional arguments converge. If the pre-emption of certain elements of state child support laws has been accomplished, what are the constitutional ramifications of such a selective pre-emption? Can a child previously entitled, under state law and often state court order, to receive a specific amount of monthly child support for his or her exclusive use and benefit be deprived of the protective restrictions on the use of his or her money by virtue of his or her membership in a particular type of family unit, a unit composed of children with child support income and children whose only source of support must be AFDC because their fathers are unable or unwilling to support them? Alternatively, if the attempted pre-emption has not been executed correctly, can the state confiscate child support pursuant to the state and federal regulatory guidelines, thereby depriving a targeted set of children of the still extant and otherwise enforceable protections of state law again because the child lives in a family with a particular configuration of members?

Those questions will now be addressed more fully.

## VI. THE LANGUAGE AND LEGISLATIVE HISTORY OF THE 1984 DEFRA AMENDMENT DEMONSTRATE CONGRESSIONAL INTENT TO PREEMPT STATE LAW RESTRICTIONS ON THE USE OF CHILD SUPPORT THAT WOULD PREVENT THE STATE FROM TREATING ONE CHILD'S SUPPORT INCOME AS FAMILY INCOME.

North Carolina law obligates parents to support their offspring. N.C.G.S. § 50–13.-4(b) requires that "the father and mother shall be primarily liable for the support of a minor child...." N.C.G.S. § 50–13.4(c) further prescribes that "[p]ayments ordered for the support of a minor child shall be in such amount as to meet the reasonable needs of *the* child for health, safety, and maintenance...." N.C.G.S. § 50–13.-4(d) adds that child support payments for a minor child must be paid "to the person having custody, any proper agency, or to the court for the benefit *of such child*." [Emphasis added.]

North Carolina courts have interpreted the state's child support laws to require that child support money be spent only on the child for whom the support has been obtained. In *Goodyear v. Goodyear*, 257 N.C. 374, 379, 126 S.E.2d 113 (1962), the North Carolina Supreme Court wrote:

> "While defendant [father] was and is obligated to make the monthly payments called for in his contract for the support of his children, plaintiff [mother] is not the beneficiary of the moneys which defendant must pay. These moneys belong to the children. Plaintiff is a mere trustee for them. That part of the payments not reasonably necessary for support and maintenance, she must hold for the benefit of the children and account to them when they call upon her. She cannot, by contract with another person, profit at the expense of the children."

Similarly, *Tyndall v. Tyndall*, 270 N.C. 106, 153 S.E.2d 819 (1967), recognized that a cause of action for the benefit of the children would exist if the custodial parent used the money paid for support of the children for any other purpose.

The statutes' own terms and their subsequent interpretation by North Carolina's highest court reveal the legal restrictions on the use and attribution of child support income. The affidavit of Judge Patricia S. Hunt, District Court Judge in North Carolina Judicial District 15B, explains how these restrictions work in practice:

> "6. Under North Carolina statutory and case law, a District Court Judge is

required to order the payment of child support based solely on the needs of the child and the needs and ability of the noncustodial parent to contribute to the support of the child.

"7. When setting the amount a noncustodial parent is required to pay for the support of a child, a District Court Judge *is not permitted to consider the needs of other children who may live in the household, who are not the children of the noncustodial parent.* [Emphasis added.]

"8. Under North Carolina Law, a District Court Judge cannot order a man to pay child support unless there has been a determination of his paternity of the child and therefore, a conclusion that he has a legal responsibility for support.

"9. When ordering the payment of child support, a District Court Judge specifically names the parent who is to pay the support and the child for whom the support is designated. *It is a violation of a court order for a custodial parent to spend the child support on other children not designated in the child support order.* [Emphasis added.]

"10. Under North Carolina law, parents have a legal obligation to support their children. If a custodial parent refuses to provide for the needs of his child, the child may be removed from his custody by court order and placed in the custody of the Department of Social Services."

Hunt Affidavit, p. 2.

Unless state law has been pre-empted, when North Carolina compels an AFDC mother to count child support income of only one child as a family financial resource, it requires her to violate the child support laws in order to obtain AFDC funds to support her other children.

A. Plaintiffs Have Standing To Challenge Whether Congress Has Pre-Empted State Domestic Relations Law.

▆▆▆ The court does not agree with defendants' allegation that movants lack

standing to raise what defendants refer to as "the Tenth Amendment issue." Plaintiffs can draw on the Tenth Amendment as support for their argument that state law, especially state family law, deserves special recognition and respect. Tenth Amendment precepts bolster plaintiffs' argument that the Supremacy Clause should be carefully and sparingly applied *in the domestic relations context.* Plaintiffs, however, rely on Supremacy Clause cases which themselves demonstrate that individuals can raise Supremacy Clause questions without facing any standing obstacles. Although the Supremacy Clause and the Tenth Amendment (both structural constitutional norms) directly regulate relations between governments rather than the relations between governments and individuals, nevertheless, individuals should have standing to assert constitutional protections derived from them. *Cf. Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In *Chadha,* an individual facing deportation had standing to challenge a legislatively mandated procedure that violated the constitutional principle of bicameralism, another structural norm, as long as the individual had suffered an injury in fact and could demonstrate that the judicial relief requested would prevent or redress the claimed injury.

B. State Domestic Relations Laws Are Not Pre-Empted Unless Pre-Emption Is Positively Required By A Direct Federal Enactment.

The United States Supreme Court has repeatedly recognized that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *In re Burrus,* 136 U.S. 586, 593–94, 10 S.Ct. 850, 853, 34 L.Ed. 500 (1890); *Wetmore v. Markoe,* 196 U.S. 68, 25 S.Ct. 172, 49 L.Ed. 390 (1904); *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979). When state family law appears to conflict with a federal statute, the Supreme Court has limited

its review under the Supremacy Clause to a determination whether Congress has "positively required" the pre-emption of state law "by direct enactment." *Wetmore v. Markoe, supra,* 196 U.S. at 77, 25 S.Ct. at 176. If that has been done, state family law provisions will be overridden only if they do "major damage" to "a 'clear and substantial' federal interest." *Hisquierdo v. Hisquierdo,* 439 U.S. at 581, 99 S.Ct. at 808, *with references to United States v. Yazell,* 382 U.S. 341, 352, 86 S.Ct. 500, 506, 15 L.Ed.2d 404 (1966). State laws have been struck down only when rights and expectations established under federal law are threatened by the continued operation of state law or when the enforcement of state law would frustrate or undermine the necessarily uniform implementation of Congressional policy.

The Fourth Circuit recently applied these pre-emption rules in *Caswell v. Lang,* 757 F.2d 608 (4th Cir.1985). In *Caswell,* the court scrutinized an apparent conflict between the federal bankruptcy code, 11 U.S.C. § 1301 *et seq.,* and Virginia's child support laws. A Virginia father attempted to restructure his child support arrearages by including them in a Chapter 13 restructuring plan. The mother asserted that the bankruptcy court lacked the authority under the federal code to modify child support obligations established under state law and by state court order. The Fourth Circuit found that the bankruptcy statute gave "no suggestion that Congress specifically intended ... to include past due child support obligations in a Chapter 13 reorganization plan...." Therefore, it found no "clearly conflicting federal enactments" requiring the pre-emption of state law. 757 F.2d at 610 n. 3.

Applying *Hisquierdo* and *Caswell,* movants argue that 42 U.S.C. § 602(a)(38), the DEFRA language at issue here, fails to demonstrate congressional intent to override state child support laws. Thus, plaintiffs propose that 42 U.S.C. § 602(a)(38) fails to meet the *Hisquierdo* "positively required by direct enactment" standard. This court cannot agree.

C. The Language And Legislative History Of DEFRA Demonstrate That Congress Did Intend To Pre-Empt State Law.

Congressional pre-emptive intent can be found most easily when the statutory terms address and resolve the conflict with state law. *See, e.g., Hisquierdo, supra,* 439 U.S. at 576, 99 S.Ct. at 805 (Railroad Retirement Act, 45 U.S.C. § 231m, stated: "Notwithstanding any other law of ... any State ..., no annuity ... shall be assignable or be subject to ... attachment, or other legal process under any circumstances whatsoever...." However, pre-emption has been recognized in contexts where congressional intent must be drawn from the language, structure and history of a statute or set of statutes. As *McCarty v. McCarty,* 453 U.S. 210, 220–21, 101 S.Ct. 2728, 2735, 69 L.Ed.2d .589 (1981), explained, *"Hisquierdo* did not hold that only the particular statutory terms there considered would justify a finding of pre-emption; rather, it held that '[t]he pertinent questions are whether the [state law] rights asserted conflict with the express terms of federal law and whether its consequences sufficiently injure the objectives of the federal program to require non-recognition'" (quoting *Hisquierdo, supra,* 439 U.S. at 583, 99 S.Ct. at 809). As *McCarty* demonstrated, the meaning of statutory terms can often be confidently discerned only after an examination of the legislative history and the relevant federal program's history of operation. Review of subsequent implementing federal regulations also often clarifies legislative meaning and demonstrates congressional pre-emptive intent. *See, e.g., Ridgway v. Ridgway,* 454 U.S. 46, 53, 102 S.Ct. 49, 54, 70 L.Ed.2d 39 (1981).

Invoking the *Hisquierdo/Yasell* principle that state family law can only be overridden if it threatens to do "major damage" to "a clear and substantial federal interest," plaintiffs also question whether the DEFRA amendment's objective (budgetary saving) represents such a federal interest and whether the continued enforcement of

state child support laws would actually inflict "major damage" on efforts to reduce federal expenditures.

Though the exact magnitude of the anticipated saving is not known, the reduction of family benefits would be significant and, in this period of mounting public concern about the eventual economic consequences of increasingly large federal deficits, neither the saving nor the statutory objective can be characterized as insubstantial.

■ The court therefore finds that Congress has pre-empted state child support laws in so far as those laws restrain the use and distribution of child support income received by a child who lives in a home in which the mother and her other children rely on AFDC in order to live.

After exploring the DEFRA amendment's legislative history and implementing regulations, the court is confident that Congress contemplated the conflict between its objectives and state law and chose to pre-empt those protective restrictions that would prevent the treatment of one child's child support income as a family financial resource.

It is possible that this court's reading of *Hisquierdo* and its progeny may not show sufficient deference to state law. Perhaps when the state law affected governs as important an aspect of domestic relations as the enforcement of the parental duty to support minor children, a reviewing court should demand greater precision in the actual legislative text before recognizing a congressional intention to pre-empt state law. *Cf. McCarty v. McCarty, supra*, 453 U.S. at 237, 246, 101 S.Ct. at 2748 (Rehnquist, J., dissenting) (After reciting the "positively required by direct enactment" test from *Wetmore* and *Hisquierdo*, Justice Rehnquist argued that "[t]he most the Court can advance are vague implications from tangentially related enactments or Congress' *failure* to act. The test established in *Hisquierdo* established that this was not enough." Justice Rehnquist, joined by Justices Stewart and Brennan, insisted that "pre-emption by negative implication" was insufficient under *Hisquier-*

*do*.) With that possibility in mind, the court will analyze the constitutional deficiencies posed by the federal statute and state and federal regulations from alternative premises: first, that a pre-emption of state law has been accomplished and, second, that it has not.

## VII. THE FEDERALLY SANCTIONED STATE REQUIREMENT THAT MOTHERS SEEKING AFDC FOR THEIR UNSUPPORTED CHILDREN MUST ASSIGN TO THE STATE THE CHILD SUPPORT RIGHTS OF AN ADEQUATELY SUPPORTED CHILD UNCONSTITUTIONALLY DEPRIVES THE SUPPORTED CHILD OF PROPERTY. WHEN THE STATE COOPERATES WITH A FEDERAL PLAN TO COMPEL A MOTHER TO SURRENDER ONE CHILD'S INCOME SO THAT THE REMAINING CHILDREN CAN SURVIVE ON AFDC, THE STATE TAKES PROPERTY FROM THE CHILD'S TRUSTEE AND IMPOSES AN UNCONSTITUTIONAL TAX ON THE SUPPORTED CHILD'S MEMBERSHIP IN A PARTICULAR TYPE OF FAMILY UNIT. THE STATE THUS BECOMES THE FEDERAL GOVERNMENT'S PARTNER IN A TAKING.

### A. The Child Receiving Adequate Child Support Suffers A Loss Of Property As A Result Of The Enforcement Of The SFU Regulations.

■ Defendants emphasize that families choose to participate in the AFDC program and contend that such voluntary action eliminates the possibility of a taking or other constitutionally cognizable injury. The child receiving child support can and does make no choice regarding participation. The minor child automatically becomes a member of the AFDC unit if his or her mother and half-siblings apply for assistance. As a minor, the child's financial affairs are handled by the mother/caretaker. The falsity of the freedom of the mother, whose options are to reduce one child's

child support income or cut her other children off from their sole source of support, AFDC, is painfully clear.

Defendants propose that mothers in mixed income families have the option of continuing to spend an amount equivalent to the full child support amount on the child entitled to child support even after he or she becomes a part of the AFDC unit. The child's income level could, according to defendants, be maintained in this way even while the SFU regulations are in operation. That "option" is illusory. If a mother did spend such a disproportionate share of her AFDC grant on one child, she would surely violate 42 U.S.C. § 605, which requires a mother/caretaker to use the grant money in the best interest of *all* the children in the unit or face administrative review of her conduct, possibly subjecting herself to civil or criminal penalties.

State defendants suggest that their regulations do no more than *"authorize ...* sharing" between children (emphasis added). What defendants really do is *require* the sacrifice of income a child has no duty to provide to his or her family. The child entitled to child support has no legal duty to support his or her mother and half-siblings. This is demonstrated by the fact that, even under the SFU regulations, if such a child moved out of the mother's household and lived with the father, neither the child nor the father would have to continue to contribute to the support of the mother and her other children. State defendants also argue that the child receiving child support experiences no loss of income as a result of the assignment of rights and the child's forcible inclusion in the AFDC unit. The child's income, according to defendants, only "passes through" the state to the child! Since only fifty dollars flows back to the child alone, it is difficult to accept defendants' proposition that no loss of income has occurred. If the child deposited $200 in a bank, for example, and was told, upon attempting a withdrawal, that only fifty dollars was unconditionally retrievable, it would be hard to convince either the child or an observer that nothing had been lost. Defendants propose that

the child derives certain value-equivalent, albeit unasked for, benefits from the assignment system that, in effect, compensate the child up to the level of the original support amount. For example, the defendants assert that the now poorer child is "happier" for having "shared" his or her income with the mother and needy half-siblings. It may well be that one child wished to help another, but that possibility is no justification for the government to take what the child has not offered.

Another hypothetical form of compensation suggested by defendants is the enhanced security the state provides by policing the absent father's delivery of support and pursuing him upon failure to make full payment. Defendants' service, of course, no longer principally benefits the child but primarily works to the advantage of the state and federal treasuries. In addition, it is far from clear that a rational person in the position of the child entitled to child support would pay such a substantial portion of his or her income for the questionable security now offered, *arguendo*, by counsel.

Defendants' system has already discouraged some absent fathers from continuing to honor their support obligations. *See* Thomas Supplemental affidavit, ¶¶ 1–7 (describing John Pennington's refusal to support his son Sherrod when the total amount would no longer go to Sherrod); Jefferys Affidavit, ¶ 9 (recounting Michael Jefferys' discontinuation of support payments in reaction against the SFU system); Medlin Affidavit, ¶ 12 (describing Bobby Harrington's objection to the assignment of daughter Karen's income and Ms. Medlin's decision to send Karen back to her father rather than jeopardize or diminish the child's income). These negative paternal reactions present a risk of non-collection ignored by the defendants. The cost of pursuing deliberately delinquent fathers will not be insignificant. Also, those fathers who voluntarily provide regular support payments but whose paternity has not been legally established will prove particularly difficult

and costly targets for collection. District Court Judge Hunt has stated:

13. If a father refuses to pay support, I have very few legal tools to utilize to force him to pay child support.

a. I can threaten a father with a jail term, or actually order him to jail, but a father does not pay child support while he is in jail, so that a jail term rarely results in income for the family.

b. I have the power to garnish wages, but I have found that fathers who fail to accept their responsibility and do not want to pay support change jobs frequently in order to avoid court orders. Another problem with the garnishment of wages is that in North Carolina, especially in rural counties, the employers who do not want to bother with the paperwork of garnishment will fire their employees or will pay them under the table in order to avoid the garnishment order. Although I tell fathers they have a legal remedy if the employer fires them, the reality is that the employers find another excuse to fire the employee.

Hunt Affidavit, ¶ 13.

In light of these facts, the compensatory value of state collection security appears minimal at best and far less than the monetary loss experienced by the supported child.

**B. By Pre-Empting State Law Restrictions On The Use And Distribution Of Child Support Paid By A Father For The Benefit Of His Child, DEFRA Becomes The Instrument Of A Taking.**

Regardless of the "relative importance to the state of its own law," "when there is a conflict with a valid federal law," the federal law must prevail. *Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962); *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 210–211, 6 L.Ed. 23 (1824). Assuming that Congress has communicated its goal of pre-empting state child support law with the requisite clarity, the constitutional validity of the federal enactment is doubtful. The DEFRA amendment and the state and federal regulations under it dilute the protection state law offers to certain children receiving child support. The selective pre-emption of state law represents an unconstitutional taking that deprives the children of their entitlement to child support simply because they live with a needy mother and half-siblings.

The child receiving child support has access to this income only through his or her caretaker, who acts as a trustee administering the child's money. However, as explained by the previously discussed North Carolina Supreme Court decisions, until the passage of DEFRA, the money belonged *only* to the child. Even if Congress has pre-empted the legislatively created and judicially imposed obligation of the caretaker/mother to use a child's income only for that child, the child retains the *right* to receive child support, even to receive the *same amount* of child support as was prescribed by an original child support order, which was formulated on the assumption that the total amount was necessary to meet the child's basic needs. However, under the DEFRA/SFU plan, the child has lost the previously existing guarantee that the caretaker will act as a trustee, using the child support received only for that child's benefit. Thus, although the *right* to the specified amount of child support has not been extinguished, the right has clearly taken on a new, shrunken form.

**C. A Taking Can Occur When Regulation Reshapes A Property Right.**

In considering whether a taking has occurred in cases involving government regulation, a court traditionally looks to the economic impact of the regulation, the regulation's interference with investment backed expectations, and the character of the challenged government action. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Intangible interests comparable to the right to receive and use a court-ordered amount of child support have been recognized as property for the purposes of takings analysis. *See, e.g.,*

*Ruckleshaus v. Monsanto,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (trade secrets; health, safety, and environmental data); *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (materialman's lien); *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) (valid contracts).

As a result of the DEFRA/SFU regulations, a child previously entitled to child support has lost the right to enforce the fiduciary obligation that prohibited the mother from spending the money on anyone other than the designated child. The right to exclude others is generally "one of the most essential sticks in the bundle of rights commonly characterized as property." *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979). Although the child receiving child support income remains entitled to the full child support amount, as evidenced by the state's acquired right to institute legal action against a father who does not pay the whole amount, the child can only maintain *unrestricted access* to the money if the child lives in a household separate from his or her mother and half-brothers and sisters. This condition on access significantly diminishes the value of the child's enforceable right. *Cf. Moore v. City of East Cleveland,* 431 U.S. 494, 520, 97 S.Ct. 1932, 1946, 52 L.Ed.2d 531 (1977) (Stevens, J., concurring) (analyzing single family occupancy zoning ordinance that applied restrictive definition of family as a taking in which unjustified restrictions were imposed on the affected property-owner's right to use her property as she saw fit).

■ When a regulation goes too far in reducing the values incidental to property, a taking has occurred. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). From the perspective of the child receiving child support, that is what has happened here. Borrowing from the language of *Armstrong v. United States,* 364 U.S. at 48, 80 S.Ct. at 1568, "[b]efore the [child support rights] were destroyed, the [children] had compensable property. Immediately afterwards, they had [substantially less]. This was not because their property vanished into thin air. It was because the government for its own advantage destroyed the value of [their rights]."

Although, for example, the child's father must continue to pay the full court-ordered amount or face prosecution by the state, the child will now receive unqualified use of only fifty dollars from that amount. Thus, the child experiences a significant adverse economic impact as a result of the SFU regulations if his or her half-brothers or sisters need to receive AFDC. From the absent father's point of view, a corollary harm occurs. Under the SFU regulations, his investment in the child's well-being and development, his child support payment, is diverted away from his child to the state through the forced attribution of that money to the child's mother and half-siblings. Thus, what once was the child's becomes the state's under the unvalidated assumption that the money belongs to the family as a whole.

■ A sovereign "by *ipse dixit,* may not transform private property into public property without compensation." *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 164, 101 S.Ct. 446, 452, 66 L.Ed.2d 358 (1980). This is particularly true when only a segment of a particular set of right-holders are selected to bear such a loss. The Takings Clause "guarantee that private property shall not be taken for a public use without just compensation was designed to bar government from forcing some people to bear public burdens which in all fairness should be borne by the public as a whole." *Armstrong, supra,* 364 U.S. at 49, 80 S.Ct. at 1569.

Under the DEFRA/SFU regulations, of all the children receiving child support in North Carolina, only those who live with needy half-siblings are required to contribute a significant portion of their income to the state in the name of their needy half-siblings in order to reduce state and federal AFDC expenditures. Thus, not only are the affected children deprived of certain

valuable "sticks," such as exclusive use of their money, from their child support property "bundle," *Kaiser Aetna, supra,* they are so deprived *on the basis of the composition of their family,* a constitutionally impermissible basis, and to the detriment of a fundamental constitutional interest, the right to maintain existing family relationships.

D. Even If Congress Has Failed To Pre-Empt Those Elements Of State Law That Would Deny The State Access To The Child Support Income Of An Adequately Supported Child Living With His Or Her AFDC Dependent Family, The State Has Forced Mothers To Surrender The Child's Property To The State In Violation Of The State's Own Laws.

If Congress has *failed* to pre-empt state law, the legal protections of the child's income under state law still exist, but *they are simply not enforced on behalf of the plaintiff class of children.* If the mothers need to obtain AFDC for the other children in the family, the children entitled to child support see the bulk of their income (anything over the first $50) taken by the state under the forced assignment system, after the money has been funneled through their half-siblings by means of the "availability" fiction. The state, wearing the cloak of federal authorization, effects an unconstitutional taking by using one set of children's needs as a lever to coerce a mother either to break her legal obligation to the child receiving child support or to see her other children go hungry without AFDC.

From the perspective of the child receiving child support, the failure of the state to enforce its own laws restricting the use of his or her income, and the state's taking of the money from his or her mother under duress represent a deprivation of property in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The child loses the use of the child support money solely because the child resides with his or her mother and needy half brothers and sisters.

From the mother's perspective, the SFU regulations require her to break one existing law to honor another. The irrationality of imposing such contradictory obligations illustrates how these regulations fail to comport with Due Process. The fact that only women who strive to maintain households composed of both children with child support income and children with no source of income other than AFDC face such an irrational choice exposes the simultaneous substantive Due Process and Equal Protection failings of the regulations.

VIII. A DEPRIVATION OF PROPERTY THAT SIMULTANEOUSLY INFLICTS DAMAGE ON A FUNDAMENTAL INTEREST, FAMILY AUTONOMY, TRIGGERS SPECIAL JUDICIAL SCRUTINY OF GOVERNMENT ACTION CAUSING SUCH INJURIES.

A government does not have unlimited power to redefine property rights, *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), and whatever power government does have cannot be exercised in a way that penalizes people, especially children, on the basis of their family status. To take property from such persons on that basis violates constitutional principles of Due Process and Equal Protection.

Examined from that perspective, the harm inflicted in this case begins to bear an alarming resemblance to the harm redressed in *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). In *Moore,* a city ordinance limited occupancy of a dwelling unit to members of a single family, but defined "family" so that a grandmother living with two grandsons who were first cousins, not brothers, did not qualify. Under the ordinance, it became a crime for the grandmother to live with the two boys. Striking down the ordinance as unconstitutional, the Court wrote:

"This Court has long recognized that freedom of personal choice in matters of

marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974). A host of cases, tracing their lineage to *Meyer v. Nebraska,* 262 U.S. 390, 399–401 [43 S.Ct. 625, 626–27, 67 L.Ed. 1042] (1923), and *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35 [45 S.Ct. 571, 573, 69 L.Ed. 1070] (1925), have consistently acknowledged a "private realm of family life which the state cannot enter." *Prince v. Massachusetts,* 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944). *See, e.g., Roe v. Wade,* 410 U.S. 113, 152–153 [93 S.Ct. 705, 726, 35 L.Ed.2d 147] (1973); *Wisconsin v. Yoder,* 406 U.S. 205, 231–33 [92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15] (1972); *Stanley v. Illinois,* 405 U.S. 645, 651 [92 S.Ct. 1208, 1212, 31 L.Ed.2d 551] (1972); *Ginsberg v. New York,* 390 U.S. 629, 639 [88 S.Ct. 1274, 1280, 20 L.Ed.2d 195] (1968); *Griswold v. Connecticut,* 381 U.S. 479 [85 S.Ct. 1678, 14 L.Ed.2d 510] (1965).... [additional citations omitted]. Of course, the family is not beyond regulation. *See Prince v. Massachusetts, supra,* [321 U.S.] at 166 [64 S.Ct. at 442]. But when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the government interests advanced and the extent to which they are served by the challenged regulation."

431 U.S. at 499, 97 S.Ct. at 1935.

The *Moore* court held that the constitutional right to live together as a family did not belong to only the nuclear family—a couple and their dependent children. *Id.* at 502, 97 S.Ct. at 1937. With that in mind, the *Moore* majority invalidated the challenged ordinance on substantive due process grounds, finding that the ordinance sought to standardize families and children, "forcing all to live in certain narrowly defined family patterns." *Id.* at 506, 97 S.Ct. at 1939. The SFU policy has the same effect, especially for families like Mary Medlin's, in which a child, like Karen, is sent away from her home with her mother and half-siblings, back to her father so the child can receive her full amount of child support without simultaneously rendering the mother's other children ineligible for AFDC.

Defendants are mistaken in their contention that their actions deserve only minimal scrutiny. Defendant's invocation of the minimal rationality standard applied in cases such as *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), *Schweiker v. Hogan,* 457 U.S. 569, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982), and *Califano v. Aznavorian,* 439 U.S. 170, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978), suggests the use of a standard inappropriate for this case. Defendants find these cases controlling only by misconstruing the focus of the inquiry. The cases cited by defendants deal only with a governmental decision to withhold a non-contractual welfare benefit. This case, however, addresses a governmental decision to intercept the delivery of *private* property, the full child support amount ordinarily available *from the father* (not the state) to the affected child. The impact of this action on the child's fundamental associational rights and on a property right requires a more rigorous examination than defendants suggest and than their behavior can withstand.

Finally, defendants attempt to meet the plaintiffs' serious questions about the burdens the SFU system imposes on family life by arguing that government can influence important choices, even choices regarding the exercise of a fundamental right, through the use of economic disincentives. *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), relied on by defendants, proceeded upon the assumption that though the unavailability of Medicaid funding might influence a poor woman's decision to have an abortion, it did not absolutely preclude her from doing so. A poor woman had no absolute right to such Medicaid coverage. Even though she did have a right to have an abortion, she did not have a right to a *state subsidized* abortion. Here, however, a child entitled

to child support must sacrifice one right to exercise another. If the child wants to live with his or her family, consisting of a mother and half-siblings, the child must surrender a right to private property, the right to derive exclusive use and benefit from money awarded to the child by state court order or voluntarily provided by an absent father. The cases cited by defendant do not control.

A. Whether Accomplished By Means Of Federal Pre-Emption Or Otherwise, The Expropriation Of The Supported Child's Property In Order To Reduce Governmental Expenditures Punishes The Child For Exercising The Child's Fundamental Right To Live With His Or Her Family.

 An otherwise valid government objective, deficit reduction, cannot be accomplished by means of the discriminatory imposition of burdens. *See, e.g., Metropolitan Life Insurance Company v. Ward,* — U.S. —, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985). By requiring AFDC applicants to count the child support income of selected children as a family resource, the federal and state governments impose a thinly disguised tax on the child because of membership in a particular type of family. To impose this type of invasive tax on children due to family circumstances beyond their control is constitutionally intolerable. *Cf. Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (Texas statute denying public education to illegal alien children violated the Equal Protection Clause of the Fourteenth Amendment. The statute irrationally imposed a lifetime hardship on a discrete class of children not responsible for their undocumented status.)

The Supreme Court has already acknowledged:

"... [O]nce a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother. For a State to do so is 'illogical and unjust.' "

*Gomez v. Perez,* 409 U.S. 535, 538, 93 S.Ct. 872, 875, 35 L.Ed.2d 56 (1973), *with reference to Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (*Gomez* found that a Texas law denying the right to parental support to illegitimate children while giving it to legitimate children violated the Equal Protection Clause). The concerted action of the federal and state governments here is equally "illogical and unjust." A child has no control over the composition of the family into which he or she is born. Therefore, the nature of the child's family cannot be the basis for the legislated deprivation of essential support.

B. The Supported Children Should Not Be Penalized For Their Mother's Alleged Past Breaches Of A Fiduciary Duty.

Both state and federal defendants contend that the DEFRA program causes no harm to the affected children because it simply recognizes and institutionalizes the actual financial practices of mothers in households composed of children receiving child support and children dependent on AFDC. They say that the child entitled to child support experiences no actual diminution of income, because mothers in mixed income families had been spending the child support money for other children's needs even before the regulations went into effect. They say their regulations now only reflect current family financial practices, and do not cause any alteration of family life.

This argument may suffer from reliance on unsubstantiated and inaccurate assumptions about maternal conduct before the SFU regulations went into effect. The testimony of plaintiff Diane Thomas is a first-hand account of real life before the SFU regulations went into effect: "... I used the money for *both* of them, sure did. If he needed something and his check was late I would use Crystal's [child support] money *and it was vice versa.*" Thomas Deposition, p. 35 [emphasis added]. Ms.

Thomas used money, a fungible commodity, fungibly. She drew from whatever resource was available at the time a need arose. This does not necessarily mean, when the family accounting (if any) was done, that, dollar for dollar, the child entitled to a full child support amount actually received any less than that amount by the end of a given month in the pre-SFU period.

More importantly, this argument by the defendants ignores the fact that the mothers, who, in moments of financial crisis, spent child support money on other children, violated their fiduciary duty to spend the money only on the specified child. The fact that some mothers may have redistributed income within a family fails to erase the legal obligation *not* to do so *and does not reduce the amount of child support owed the children.*

To dilute the rights of children to support, because some mothers, under financial stress, fail to carry out their legal duty to use the money solely for particular children, penalizes the children for parental misconduct in a manner condemned by the Supreme Court in *Plyler, supra,* 457 U.S. at 220, 102 S.Ct. at 2396:

"Their 'parents have the ability to conform their conduct to societal norms,' ... but the children ... 'can affect neither their parents' conduct nor their own status.' *Trimble v. Gordon,* 430 U.S. 762, 770 [97 S.Ct. 1459, 1465, 52 L.Ed.2d 31] (1977). Even if the State found it expedient to control the conduct of adults by acting against their children, legislation directing the onus of a parent's misconduct against his children does not comport with fundamental concepts of justice. '[V]isiting ... condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the ... child is contrary to *the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing.* Obviously, no child is responsible for his birth and penalizing the ... child is an ineffectual—as well as unjust—way of deter-

ring the parent.' *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 175 [92 S.Ct. 1400, 1406–07, 31 L.Ed.2d 768] (1972) (footnote omitted)." [Emphasis added.]

This is why the procedural due process approach of several other courts who have addressed this controversy in other states fails to redress the constitutional wrong done. *See Gorrie v. Heckler,* 624 F.Supp. 85 (D.Minn.1985); *Johnson v. Cohen,* No. 84–6277, slip opinion (E.D.Pa. October 3, 1985). Requiring (as some courts have done) a pre-termination or pre-reduction hearing to determine whether a mother who is applying for AFDC has in the past spent one child's support money on her other children ignores the immateriality of that determination to any adjudication of the child's rights.

### C. The DEFRA Scheme Endangers Family Integrity And Undermines The Well-Being Of Family Members.

Regardless of whether pre-emption has occurred, the DEFRA plan and the SFU regulations inflict needless additional burdens on already vulnerable families and threaten to disrupt already strained family relationships.

The implementation of the regulations can cause the dislocation of the child receiving child support and the disintegration of the family unit to which the child belonged. *See* Medlin Affidavit, ¶ 12. (Plaintiff Mary Medlin sent her daughter Karen to live with Karen's father, Bobby Harrington, to preserve the child's income.) Although membership in the intimate community of a particular family may not be chosen by the child, it can, nonetheless, be cherished by the child. The Supreme Court has recognized that the "importance of the familial relationship, to the individuals involved and to society, stems from the emotional attachments that derive from the intimacy of daily association" in a family's home. *Smith v. Organization of Foster Families,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977).

Mothers are also adversely affected. Pressure of the new regulations on low income mothers can be a source of anxiety. The state suddenly extinguishes or ignores the mothers' duty to deliver child support payments to the child to whom the money is given. A mother must then choose whether to continue to abide by that duty or to deny her unsupported children, whose well-being is also her responsibility, their sole source of subsistence. After complying with the SFU regulations, the mothers see their family income reduced from its already meager levels and must watch *all* their children suffer as a result. *See* Arvis Waters Affidavit, ¶ 12 (AFDC income was so low mother was unable even to purchase a small birthday gift for child); Diane Jefferys Affidavit ¶ 11 (reduction of income compelled mother to move in with her cousin's family and to rely on family members and charitable organizations for help in meeting her family's basic needs). Mothers have also been threatened with physical violence by fathers who angrily reject the idea that the children they are supporting are being placed on welfare. *See* Diane Thomas Affidavit, ¶ 8.

These government created conditions undoubtedly test these mothers' capacity to cope with the already daunting task of keeping their families intact. If a father decides to stop supporting his child as a result of the SFU regulations, or if he refuses to see the child now on AFDC despite the father's best efforts to provide support, the child and his or her mother may well also lose access to the father's kin network, which can offer broken low-income families a valuable source of support in times of crisis. *See* Declaration of Duke University professor and anthropologist Carol Stack, ¶ 9. When a mother and child are cut off from that source of aid:

"[T]he mother is placed under great emotional and physical stress, and the child, in consequence, whose development is already at risk, is placed in an even more vulnerable position.... A study of child abuse by Michael Wald, Professor of Law at the Stanford University Law School, demonstrates that mothers and

children are more vulnerable when there is a lapse in the viability of the family network. When mutual aid is provided by the kin network, children are less at risk; when the mother becomes unable to rely on the network, that is when the incidence of child abuse, neglect and other problems increases." *Id.* at ¶ 15.

D. The DEFRA/SFU Plan Contradicts Existing Incentives For Fathers To Recognize And Honor Their Duty To Support Their Children.

The evidence shows that the SFU objective, the attribution to the whole family of money paid by an absent father for his child alone, and the inclusion of the father's child in an AFDC unit, frustrate and anger fathers who have met their legal and moral obligations to support their offspring. Fathers justifiably proud of being able to keep their children off welfare by paying regular support now see that accomplishment erased. Such a father is powerless to keep his child out of the welfare system as long as the child lives with the mother and needy half-brothers and sisters. (A child often lives with the mother because she has been awarded legal custody by a state court or because the father is unable or unwilling to allow the child to live with him.)

The fathers' perceived loss of control over their children's fates causes some fathers to refuse to continue to provide support. Fathers who rebel against the system by withholding support that will no longer go to their children face criminal prosecution for non-support. *See* Affidavit of James Richardson, father of Ms. Medlin's son Jermaine, ¶ 5. Other fathers react by withdrawing from their children's lives, sending a monthly support payment but never seeing the child. For instance, Sherrod Thomas' father, John Pennington, began to withhold support for Sherrod when he learned the money was being assigned to the state so Ms. Thomas and her daughter Crystal could qualify for AFDC. Mr. Pennington eventually resumed his payment of support but no longer visits his

son, whom he had previously seen regularly. Mr. Pennington has told Ms. Thomas that he stopped seeing his son because the child is on AFDC. Upset and puzzled by his father's behavior, Sherrod has begun to display inappropriate behavior at home and at school. *See* Diane Thomas Affidavit, ¶ 11, and Diane Thomas Supplemental Affidavit, ¶¶ 1–7.

The fathers' reactions validly demonstrate not only how the SFU system weakens family relationships but also how the SFU regulations undermine other measures enacted to reinforce an absent father's sense that he has a duty to support his child. *See, e.g.,* 42 U.S.C. § 651 (Supp. II 1984) (providing federal support for state efforts to improve collection of child support); *McClelland v. Massinga,* 786 F.2d 1205 (4th Cir.1986) (upholding against due process challenge Maryland State Tax Refund Intercept Program, which authorizes the state Comptroller to withhold the tax refunds of fathers delinquent in paying their child support).

Historically, public policymakers have seen the enforcement of child support obligations as essential to keeping children off welfare. *See Hisquierdo, supra,* 439 U.S. at 576, 99 S.Ct. at 805 ("Concerned about [Railroad Retirement] recipients who were evading support obligations and thereby throwing children and divorced spouses on the public dole, Congress amended the Social Security Act by adding a new provision, § 459, to the effect that, notwithstanding any contrary law, federal benefits may be reached to satisfy a legal obligation for child support or alimony ... 42 U.S.C. § 659" [footnote omitted]). *See also* 1984 U.S.Code Cong. and Admin.News 2397, 2402, Sen.Rep. No. 98–387 (Examining the legislative history of federal child support enforcement initiatives, the Senate Finance Committee found that its 1974 proposal to create a new child support enforcement program had been explained as follows: "The Committee believes that all children have the right to receive support from their fathers. The Committee bill ... is designed to help children attain this right, including the right to have their fathers identified so that support can be obtained. The immediate result will be a lower welfare cost to the taxpayer but, *more importantly, as an effective support collection system is established fathers will be deterred from deserting their families to welfare and children will be spared the effects of family breakup."* [Emphasis added.]).

Here the angry fathers do not abandon their children to welfare; they see children they are supporting conscripted into the welfare system. Drawing on her studies of low income families in general and of low income black families in particular, Duke University Professor Stack describes the fathers' experiences:

"12. When it is possible for a father, married or single, to provide enough child support to keep his child off the welfare rolls, this act of responsibility and integrity brings status to the father, especially in communities in which a future of chronic unemployment is a real risk for many children. This is not to imply that being on welfare necessarily entails a stigmatized status, for it is a necessity for the majority of black mothers. Rather, there are incentives within the structure of black communities, as well as in the public sector, that encourage fathers to keep their children off the welfare rolls. A father gains great self esteem and status in low income communities if he can give his child the chance for a life of gainful employment rather than welfare dependency.

"13. In communities whose families live in poverty, fathers who are able to support their children are considered to have a depth of character and integrity that defies unfair myths and stereotypes about fathers in general, and black fathers in particular. A law that tells fathers that their efforts cannot keep their children off the welfare rolls, or that what they can provide is not good enough, challenges the efforts and integrity of good men and fathers. Feelings of anger, frustration and shame are not inappropriate or unexpected. The anger

is sometimes vented at children, sometimes at mothers, more often both."

Stack Declaration, ¶ 12 and ¶ 13.

In performing her child support enforcement duties, North Carolina District Judge Hunt has also learned much about the incentives and disincentives to which fathers respond:

"11. ... One of my greatest tools for instilling ... responsibility has been a lecture to the parents about the importance of supporting a child and thereby removing that child from the public assistance rolls. I usually give the parents thirty (30) days to go out to find a job. I have observed the pride of accomplishment with which fathers have responded when they return to court to announce that they have obtained employment and their child will no longer be on 'welfare'.

"12. Conversely, I have also observed the outrage a father has expressed when I have had to explain to him that even though he is providing support for his child, his child must be placed on the AFDC rolls so that the other children in the household can get AFDC. One father exploded in the courtroom yelling 'I won't have my child on welfare! I support him. And I'm not going to support anyone else's children!' I fully expect to continue hearing fathers' refusals to pay child support when they learn that their child support is being paid to the Department of Human Resources instead of to their children, and when they discover that their child is on welfare even though they are paying support regularly.

\* \* \* \* \* \*

"15. As a result of the standard filing unit regulations, I can no longer encourage fathers to take responsibility for their children by talking to them about the importance of removing their children from the welfare rolls. They can no longer free their children from welfare unless they can pay enough money to support the entire family. Most of these fathers are making minimum wage, and they will never be able or willing, to pay child support for children not their legal responsibility and thus they cannot even rescue their own child. Many of these fathers grew up on welfare and they are very sensitive to the invasion of privacy the household experiences when the social workers come into their homes and to the lack of a father involved in their lives. They know and understand the pride the child feels when he or she can say 'my daddy supports me.' These fathers know firsthand that the children will grow up knowing that they are on welfare and that their mothers depend for support on a check each month from the Department of Human Resources and that food stamps buy the groceries. It isn't the same as financial and emotional support from your own father.

"16. It is my experience that responsible people obey laws because they have something to lose—their money, their reputation, their freedom, or their pride. A substantial portion of our population has no money or reputation. When we take away their pride they have nothing to lose but 30 days in jail and there the whole scenario begins again."

Hunt Affidavit, ¶ 11, 12, 15, 16.

The documented effect of the SFU regulations on previously cooperative fathers' willingness to pay child support not only demonstrates how the regulations interfere in family life but calls into question the extent to which the DEFRA/SFU plan will actually achieve its goal, turning the pockets of selected fathers into a new source of government revenue. As *Moore v. City of East Cleveland, supra,* admonished, when government regulation penetrates the private realm of family life, as it certainly has here, such government intervention will only be tolerated when government can demonstrate that an important government interest is advanced by the regulation and that the mechanism chosen to advance the interest actually serves that end. 431 U.S. at 499, 97 S.Ct. at 1935.

E. By Forcing The Realignment Of Parental Duties, The Federal And State Governmental Actions Weaken The Underpinnings Of Family Life.

The required SFU regulations give the state significant leverage over the affected families and obviously influence crucial decisions about how, where and by whom children will be raised. Our Constitution protects the "liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). *See also Wisconsin v. Yoder*, 406 U.S. 205, 232–233, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972).

Significantly, here, the state's motive for intervening in the "private realm of family life," recognized in *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), is *not to improve the lot of any member* at the expense of the liberty of others. Rather, here the government enters and influences family relationships in the name of state budgetary savings, to the financial and probable emotional detriment of all family members. Such interference ironically occurs in a program, AFDC, which operates under the following "authorization of appropriations":

"For the purpose of *encouraging the care of dependent children in their own homes or in the homes of relatives* by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living *to help maintain and strengthen family life* and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for aid and services to needy families with children."

42 U.S.C. § 601 [emphasis added].

Using the plaintiffs' experiences as references, the children receiving child support experienced reductions in income of between 23% and 48.5% when they were included in the AFDC unit. The AFDC income available to meet the needs of the mother and her other children is also reduced, and the absent father experiences a reduction of the value of what could be called his child support investment. He is no longer assured that, for example, his $200 payment will help his child survive or thrive. Now only a fraction of his money will go to *his* child and the remainder will become the father's contribution, ostensibly to his child's half-brothers and sisters to whom he owes no duty of support, but actually to the state and federal treasuries.

These facts illustrate how the DEFRA/SFU regulations represent the nationwide resurrection of the practice forbidden by *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). There, the Supreme Court invalidated Alabama's "substitute father" regulation, which denied AFDC payments to children whose mother cohabited in or outside her home with an able-bodied man. An example of the attribution of non-existent resources to a family applying for AFDC, the regulation required the denial of benefits without any inquiry into whether the man was the children's father and had an obligation to support the children or did, in fact, do so. The Supreme Court struck down the regulation as inconsistent with federal statutory intent to provide aid to children deprived of the support or care of a parent who was legally obligated to support them. What once was a state aberration has now become national law. Under DEFRA's presumption of availability, an absent father paying child support to his child becomes the *de facto* provider for all children living with his child's mother.

Traditional notions of responsibility are radically revised by the DEFRA/SFU system. Fathers who are financially able to support their child and who recognize their obligation to do so are irrationally penalized and undoubtedly confused when their monetary contribution to the child's upbringing is commandeered by the state. Mothers in the affected families are similarly bewildered when the state effectively asks them to choose between the equally compelling rights and expectations of their children. Such mothers justifiably question why one set of children in the family must suffer for the others to survive. Were the children receiving child support able to represent their own interests and raise their own voices in protest against the SFU system, they too would wonder why one child in a family must suddenly be involuntarily thrust into the role of provider for the other members of the family.

F. Though The Reduction Of Governmental Deficits Is An Important Objective Worthy Of Legislative Attention, The Constitution Should Not Permit Family Duties To Be Destroyed So That Federal Dollars Can Be Saved.

A long line of legal authority supports the proposition that government can interject itself in family life and alter members' most intimate arrangements only when armed with a compelling justification and an appropriately tailored instrument of intervention. *See, e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

Families, poor and rich alike, are our nation's foundation, an irreplaceable resource which cannot be traded away to reduce the national debt. Children are a similarly invaluable national asset. Ironically here, lawmakers' and voters' concern about escalating deficits has intensified as a result of the perception that these deficits threaten to rob future generations of economic security. Legislators' desire to avoid the prospective economic harms to generations of children, some not yet born, does not erase the present property and associational rights of the children in the families affected by the SFU regulations. The Constitution's consistent recognition and protection of family associational rights prevent the state and federal governments from using children's unchosen membership in a family that includes AFDC dependent half-sisters and brothers as the justification for the deprivation of property. For the injured children and their relatives, the price of reducing federal deficits should not be the legislated sacrifice of property rights or family life.

## IX. THE RELIEF THAT IS DUE
Plaintiffs are entitled to full relief.

Both state and federal defendants should be enjoined from further enforcement of DEFRA/SFU income attribution regulations. State agencies should no longer require an AFDC applicant with a child who receives child support income to assign that child's child support rights to the state in order to obtain AFDC for the applicant's remaining children. The federal government should no longer require state officials to do so. State defendants should be ordered to pay retroactive AFDC benefits to all families in North Carolina whose benefits were denied, reduced or terminated as a result of the enforcement of the SFU regulations. State defendants are entitled to appropriate relief in their cross-action against federal defendants.

Retroactive benefits are properly available in this case. Unlike *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), where, at the time a constitutional violation was found, state officials were under no court imposed obligation to conform to a different standard, the state here was still acting under the restrictions imposed by this court's earlier injunction, which forbade the involuntary attribution of child support income to a family in which some children received adequate child support income and some received only AFDC. That injunction still

binds the state defendants as it has not been stayed, vacated or reversed. *Pasadena City Board of Education, supra.* The state defendants did not seek relief from the provisions of the original injunction by formal motion until after plaintiffs filed for further relief, nine months after the SFU regulations had been put into operation in contravention of this court's earlier injunction.

Although the legislative and federal regulatory background changed due to the passage of the DEFRA amendments and the promulgation of the implementing regulations, the state was not thereby absolved of its duty to seek relief from the outstanding injunction before acting in direct violation of it. State defendants were aware of the conflict between the anticipated SFU regulations and this court's outstanding order. On August 22, 1984, the North Carolina Division of Social Services, Planning and Information Section, issued a memorandum that stated:

> The effect of this law on *Guilliard* [sic] will depend on whether or not the new law supercedes the court order. If it does, *Guilliard* would be voided. If not, the State would be placed in much the same position as exists in *Alexander v. Hill,* i.e., either comply with a court order and lose compliance with Federal regs, or vice versa. If the State chose the court order in such a situation, the state would be responsible for AFDC payments to such cases.

Despite its own cognizance of perceived conflicting obligations, not completely unlike those to which the movant mothers are subjected under the SFU regulations, the state chose to defy the operative injunction and did not return to court for a ruling on the apparent conflict.

When the state defendants began to deny AFDC applications and to reduce or terminate benefits under the SFU regulations, they were still obligated under court order to provide such benefits, regardless of whether or not a caretaker/applicant had assigned the child support rights of selected children to the state. As cogently explained in *Daubert v. Percy,* 713 F.2d 328, 329–30 (7th Cir.1983):

> "Not every award of retroactive monetary relief payable from a state treasury violates the Eleventh Amendment. Had the Secretary chosen to defy the 1973 injunction instead of moving for relief from it, the district court could have held him in contempt and ordered him to pay from the state treasury benefits that had already accrued. *Hutto v. Finney,* 437 U.S. 678 [98 S.Ct. 2565, 57 L.Ed.2d 522] [1978] ... Ordering a state to pay benefits that it had been required to pay ... is no more disruptive of its budget process than is asking it to pay a civil contempt fine...."

## X. CONCLUSION

Plaintiffs are entitled to relief as above indicated, and to costs and attorney fees. They will tender appropriate orders and serve them on all other counsel.

State defendants are entitled to appropriate relief in their cross-action against federal defendants. They will tender appropriate orders and serve them on all other counsel.